[Civ. No. 9908. Second Appellate District, Division One.—April 23, 1936.]

LOREN E. CRISS, Respondent, v. THE ANGELUS HOSPITAL ASSOCIATION (a Corporation) et al., Defendants; R. B. JENKINS, INCORPORATED, et al., Appellants.

Mills, Hunter & Dunn and Noel B. Martin for Appellants.

Holbrook, Taylor, Tarr & Reed and Joseph D. Taylor for Respondent.

ROTH, J., *pro tem.*—Plaintiff brought this action for damages alleging malpractice resulting in the death of an infant, twelve days old. The jury brought in a verdict against all defendants upon which judgment was entered. All defendants appeal except Russell and Moore, doing business under the name of Columbia Health Foundation. Defendants Schramel, Byrne and Morris are doctors and employees of R. B. Jenkins, Incorporated, a corporation (first sued herein as The Angelus Hospital Association of Los Angeles), which corporation operates a hospital to which plaintiff's wife—the baby's mother—was, as plaintiff claims, negligently admitted, in which she was confined and her baby negligently allowed to become infected with impetigo and thereafter negligently treated, and from which she and her baby were negligently discharged. R. B. Jenkins is president of the corporation hospital, the principal owner of its stock and its general surgeon. As to his qualifications, when asked whether he could describe impetigo "as well as any other man", he admitted that "modesty prevented me from saying better than some". As already appears from what has been said, separate acts of negligence were charged in a single complaint, to wit:

(1) Admitting plaintiff's wife to the hospital;

(2) Permitting the infant to become infected with impetigo;

(3) Treatment of the infant after infection;

(4) Discharge of the plaintiff's wife and the infant from the hospital.

There was no evidence which would sustain a finding that there was negligence on the part of any of the defendants in the admission of the wife to the hospital, and this presents the first question of substance raised by defendants. Defendants requested and the court refused to give the following instruction to the jury:

"The complaint in this case, among other things, charges that the defendants were negligent in admitting Mrs. Bernice Criss to the hospital. You are instructed, however, that there is no evidence in the case which will justify you in finding any of the defendants were negligent in that respect, and so far as that feature of the case is concerned, you will find that none of the defendants were negligent."

■ Defendants contend that the failure to give this instruction constitutes prejudicial error; respondent asserts that since the evidence sustained the other allegations of negligence, it was not proper to give the instruction, and that in any event the failure to give it was harmless error. It is undoubtedly proper for a trial court to take from the jury an issue upon which there has been no evidence. (*Selden* v. *Cashman*, 20 Cal. 56 [81 Am. Dec. 93] ; *Kinsey* v. *Pacific Mutual Life Ins. Co.*, 178 Cal. 153 [172 Pac. 1098].) The trial court in this case did, however, adequately instruct the jury on all phases of the case, including that of burden of proof. It was, as a matter of law, unnecessary for plaintiff to prove all the allegations of negligence to perfect a cause of action. (*Froeming* v. *Stockton Elec. Ry. Co.*, 171 Cal. 401 [153 Pac. 712, Ann. Cas. 1918B, 408] ; *Potvin* v. *Pacific Greyhound Lines, Inc.*, 130 Cal. App. 510 [20 Pac. (2d) 129].) Plaintiff alleged several specific acts of negligence generally, as he had a right to do. (*Bergen* v. *Tulare County Power Co.*, 173 Cal. 709, 714 [161 Pac. 269] ; *Champagne* v. *A. Hamberger & Sons*, 169 Cal. 683 [147 Pac. 954] ; *Cunningham* v. *Los Angeles Ry. Co.*, 115 Cal. 561 [47 Pac. 452] ; *Manica* v. *Smith*, 138 Cal. App. 695 [33 Pac. (2d) 418].) If the several acts of negligence had been separately pleaded in separate causes of action, a motion for nonsuit or a directed verdict on the first cause of action for the first alleged act of negligence in this case would, if it had been made, have had to be granted. Since there were no separate causes of action, and since the foregoing cases establish that recovery may be had on proof of any one of the negligent acts, we are of the opinion that no prejudicial error was suffered by defendants or any of them by failure of the trial court to give the requested instruction. (Art. VI, sec. 4½, Const.; sec. 473, Code Civ. Proc.; *Etienne* v. *Kendall*, 202 Cal. 251 [259 Pac. 752]·; *Murnane* v. *Le Mesnager*, 207 Cal. 485, 495 [279 Pac. 800] ; *Clark* v. *McClurg*, 215 Cal. 279, 285 [9 Pac. (2d) 505, 81 A. L. R. 908].) Further, the case of *Eppinger* v. *Kendrick*, 114 Cal. 620, 625 et seq. [46 Pac. 613], on an analogous factual situation, while not direct authority for this view, squints in favor of respondent's position.

■ The next question of importance raised by appellants is that the trial court erred in overruling their objections to hypothetical questions propounded by respondent to his expert

witnesses. Some of the questions, to which objection was made, ended in substantially the following language: ''Assuming these facts, Doctor, have you an opinion as to whether or not *this physician* in treating *this baby* exercised that degree of skill, care and learning ordinarily possessed and exercised by physicians and surgeons practicing in the City of Los Angeles in the treatment of similar conditions?'' When the doctor responded in the affirmative to such question, he was then asked: ''And in your opinion, did or did not *this doctor* exercise that degree of care which I have stated in the question?'' Appellants' contention in this regard is that a hypothetical question thus propounded invades the province of the jury and asks the expert to decide the very question the jury must decide. Technically, appellants' position is correct. This court said, in the case of *Thomason* v. *Hethcock*, 7 Cal. App. (2d) 634, 637 [46 Pac. (2d) 832]: ''In short, the ultimate question which the jury must answer, and the question or questions which a doctor testifying as an expert must answer for the purpose of furnishing to the jury evidence upon which a jury is to make up its mind, are not identical. . . . '' The question put in the Thomason case was as follows: ''In your opinion, based upon this statement of facts, was the procedure of the defendant, in advising and in administering the treatment and in the care of the patient thereafter, such as, in the exercise of due caution and ordinary skill, would be commonly adopted and used by reputable physicians and surgeons generally in this locality under the same or similar circumstances?'' The vice of this question was pointed out in the opinion, where we state, at page 636 of that case: ''It may be conceded that the question which the jury must ultimately decide is not whether the treatment administered is such as would be commonly adopted and administered by doctors of ordinary skill in the use of ordinary care, but that the ultimate question is whether the treatment administered or the method used, whether a common method of treatment or not, was such, or was given in such a manner as indicated, suggested or demonstrated a lack of that care, training and skill which is ordinarily possessed by physicians and surgeons practicing in the same or similar communities. . . . ''

An expert testifying as a witness gives his opinion whether the doing or not doing of a certain thing conforms

to what *a hypothetical doctor,* endowed with ordinary skill and learning and exercising ordinary care and prudence, practicing in the locality in question, would or would not do. (*Reynolds* v. *Struble,* 128 Cal. App. 716, 733 [18 Pac. (2d) 690].) The expert's testimony is thus confined to what he thinks a hypothetical doctor with ordinary qualifications, exercised with ordinary skill and care, would or would not do. Such an opinion, in legal supposition, at least, is different from saying that the actual doctor in a given case is skilled or unskilled, careless or careful. The expert's opinion sets up for the use of the jury or the court a hypothetical doctor, by which the jury or court must test the skill of and the care used by the doctor actually involved. This in contemplation of the law and as a matter of actual fact is necessary, because ordinary laymen know nothing at all of medical practice and proficiency, or not enough to set up for themselves a hypothetical test doctor. In other situations growing out of lay facts, when conformity to a standard must be determined, the direct mandate of the law is that the right or wrong of such actions must be decided by what "a reasonable man" or an "ordinarily prudent man" would or would not do. The hypothetical doctor and the reasonable or ordinarily prudent man belong to the same *genus homo.* When the reasonable or prudent man is used as a test, however, all that is necessary is that the jurors search themselves and accept as final, subject to certain specific instructions, what they think a reasonable or ordinarily prudent man will or will not do. The hypothetical doctor, however, must be built up by expert testimony. So, when a hypothetical question is put to a doctor the evidence sought is not what the doctor personally thinks of what was or was not done, not whether he would do or omit to do the particular act or omission charged as negligence, not whether the actual doctor in the case was negligent in the commission or omission charged, but whether, in his opinion, a doctor of ordinary attainments practicing in the same locality and using ordinary skill and care would have done or failed to do the thing charged. When the testimony of the expert is thus limited, the expert does not, in legal theory at least, decide the question which the jury must decide. The expert does not say that the actual doctor was careless, clumsy, or below the ordinary standard of medical attainment. The jury does that, using the standard

set up by the experts. The testimony of the expert is for the guidance of the jury. (*Kershaw* v. *Tilbury,* 214 Cal. 679, 692 [8 Pac. (2d) 109].) The question in the Thomason case, as originally asked, set up a false standard, and the vice of that question was whether the doctor there involved used ordinary methods. It is obvious that the use of methods not ordinary or usual may suggest or demonstrate a doctor of the highest skill, as well as one who did not have ordinary skill. If courts were confined in their decisions on the question as to whether a doctor has used ordinary skill and care to evidence of whether or not he used ordinary practices and methods, all progress in medicine would cease. It is also apparent that ordinary methods and practices may be employed with less than ordinary skill and care. Technically speaking, therefore, defendants' question should have ended substantially in the following formula: "Doctor, have you an opinion on the facts as outlined, whether *a doctor* practicing in this locality and endowed with ordinary training, knowledge and skill, exercising ordinary care, would have treated a baby in the manner indicated?" In short, as we understand the rule, any and all hypothetical questions of the type here involved must be predicated upon what the expert thinks a hypothetical doctor should have done or should not have done. ■ In the case at bar, however, all of the hypothetical questions asked by respondent were not subject to the objection made. The question in its objectionable form was propounded to Dr. Salvin, a witness for respondent. His answer thereto cured the objectionable portion of the question. His response to the question in the objectionable form was: "The treatment differs from the usual treatment of these conditions," which, according to defendants, is exactly what the question should have called for. Also, while defendants argue at great length that the question as propounded invaded the province of the jury, defendants, instead of specifically pointing out the actual defect in the question, insisted as already appears that the question should have been confined to whether the doctor thought ordinary methods and practices were used, which, as we have pointed out, is itself a defective question. (*Thomason* v. *Hethcock, supra.*) Furthermore, we find that in propounding the second hypothetical question to Dr. Salvin, respondent completed the question as follows: "Q. In your opinion, Doctor, having in mind the facts and

circumstances . . . surrounding the hospitalization and treatment of this Criss baby, was the practice followed in that case such practice as a physician and surgeon possessing and exercising the degree of skill, care and knowledge ordinarily possessed and exercised in the City of Los Angeles, would exercise under the same or similar circumstances in the City of Los Angeles?'' The question thus put is substantially correct. On at least two other occasions, we find still other hypothetical questions put to the same doctor in substantially the same manner. In fact, except with reference to the first hypothetical question addressed to Dr. Salvin, all the others are in form and substance substantially correct. Furthermore, even with reference to the questions which are conceded to be defective, it should be borne in mind that each and every one of them after referring to ''this physician'' instead of to ''a physician'' ended with ''exercised that degree of skill, care and learning ordinarily possessed and exercised by physicians and surgeons practicing in the City of Los Angeles, in the treatment of similar cases?'' There is no doubt but that the criticised question is technically correct except in its allusion to *''this''* physician instead of *''a''* physician, and while we are convinced that the distinction between a hypothetical doctor and the actual doctor which we have pointed out is sound and should be adhered to, it would require a substantial showing, in the absence of specific objection, to prove prejudicial error thereby. In this case, it is true that the legal objection made was good, but the specific vice of the question was never pointed out, although there was much discussion on the subject. As a practical matter, the expert when testifying as to what a hypothetical doctor would or would not do, is in effect levelling at the actual doctor in the case. The law, it is true, allows only the jury to make specific application to the actual doctor in the case. There is, however, an invasion of the jury's prerogative when *this* doctor, instead of *a* doctor, is inadvertently used, but all expert testimony is an invasion of the jury's prerogative as a fact finding body. If, in legal contemplation, laymen were thoroughly conversant with the field of medicine, no doctor would be allowed to give an opinion in answer to a hypothetical question, any more than a lay witness in an ordinary collision case can give an opinion as to what an ordinarily prudent man would have done under a

certain set of circumstances. We feel, therefore, that while appellants' position is technically correct, there is in this case no prejudicial error committed by the court.

The verdict and judgment entered thereon in this case was for $6,000. Appellants contend that the amount thereof is excessive. In support of this contention the case of *Fox* v. *Oakland St. Ry. Co.*, 118 Cal. 55 [50 Pac. 25, 62 Am. St. Rep. 216], is cited, in which our Supreme Court held that the verdict for the death of an infant boy was excessive. That case was decided in 1897. The case of *O'Meara* v. *Haiden*, 204 Cal. 354, 367 [268 Pac. 334, 60 A. L. R. 1381], specifically takes judicial notice of the fact that there is a pronounced decrease in the purchasing power or value of the dollar since decisions have been made in some of the earlier cases. There is nothing in the record in this case which would indicate at first blush that the verdict was the result of passion or prejudice (*Connor* v. *Henderson*, 108 Cal. App. 237, 242 [291 Pac. 641]) ; and the later cases of our state demonstrate that the amount of the judgment in this case is not too substantial. (*Fortier* v. *Hogan*, 115 Cal. App. 50 [1 Pac. (2d) 23] ; *Frazzini* v. *Cable*, 114 Cal. App. 444 [300 Pac. 121] ; *Hill* v. *Peres*, 136 Cal. App. 132 [28 Pac. (2d) 946.) As was said in the case of *Connor* v. *Henderson, supra*, at page 242 : "Unless we are able to say that the award of damages made by the jury and sustained by the trial court was so grossly disproportionate to any compensation reasonably warranted by the facts as presented to us on appeal as to shock the sense of justice and raise at once a presumption that it was the result of passion, prejudice or corruption rather than an honest and sober judgment, this court may not exercise the power of revision. . . . " The quotation expresses our feeling in the matter.

Appellants argue further with an abundance of detail that the evidence does not support the verdict against them and specifically that the verdict is without support in the evidence as against Doctors Jenkins, Moore and Schramel. We do not intend to review the evidence in any detail, because it would serve no useful purpose. There is ample evidence to support a finding that the two defendants, who did not appeal, to wit: Russell and Moore, operating as the Columbia Health Foundation, sold health and medical services and hospitalization for a stipulated sum per month; that

plaintiff was one of their customers, and his wife one of the beneficiaries of such service; that defendants Jenkins and R. B. Jenkins, Incorporated, through Jenkins, took care of the customers of the health foundation for a stipulated sum and understood and agreed to take care of plaintiff's wife and child. In this regard defendants contended that plaintiff's contract only called for obstetrical services to the wife, and did not require any care for the child, but the distinction is too strained to be substantial, as we do not understand that when an obstetrician undertakes to deliver a woman of a child, he may order the child trundled off without a spank or a preliminary look and devote his entire attention at the time and during the hospital confinement to the mother alone. It should be said in justice to the doctors in this case that they undoubtedly feel the same way, since they did proceed to look after the infant. ■ The evidence also shows that Doctors Schramel, Morris and Byrne were employed by the hospital corporation, as well as Dr. Jenkins, and that the three first-named doctors worked under the supervision of Dr. Jenkins. The record substantially supports the jury's verdict on three charges of negligence, to wit: negligently permitting the infant to become infected with impetigo; negligence in the treatment of the infant after infection, and negligence in discharging the mother and the infant at a time when the infant was suffering from an acute attack of impetigo.

Other questions are raised by appellants, but it is unnecessary to treat them, as respondent admits in his brief: "A hospital is not a guarantor against infection. Negligence must be proved beyond a mere possibility. A physician defendant is not liable for the acts of another whom he is able neither to control nor direct. An expert witness cannot invade the province of the jury. A jury cannot decide a medical question involving scientific knowledge which has not become common knowledge, in the absence of expert testimony."

The judgment is affirmed.

York, Acting P. J., concurred.

DORAN, J., Dissenting.—I dissent.

That the evidence supports the verdict, I have grave doubts. If the evidence were overwhelming, or even substantial, the danger of a miscarriage of justice as a result of the error

complained of by appellants, would have been removed, or at least reduced to a minimum. In the light of the evidence, however, the form of the question complained of and the evidence elicited thereby, become vital. Practically all of the evidence upon which the judgment depends was given in response to the alleged improper question, and the mere asking of the question in the proper form, on one or two occasions, does not appeal to me as a remedy sufficiently effective to counteract the damage, and thus eliminate the prejudice. The question in its improper form, complained of by appellants, called for the determination by plaintiff's experts of the vital questions presented for the jury's sole determination. Although competent experts testified for the defense, no invasion of the jury's prerogatives was attempted by them, and thus the defendants were left to contend, at an embarrassing disadvantage, with plaintiff's evidence on the subject.

The prevailing opinion concedes that appellants' position is technically correct, but asserts that no prejudice resulted from the error. I am unable to bring myself to this conclusion. The evidence in response to the alleged improper questions, and by far most of the evidence upon which plaintiff relied was in response to such questions, was incompetent, and I seriously question whether there was any valid evidence at all to support the verdict. .

It is contended by appellants and conceded by respondent that there was no evidence of negligence on the part of defendants in admitting plaintiff's wife to the hospital, and, as pointed out in the prevailing opinion, if the several acts of negligence had been separately pleaded in separate causes of action, a motion for nonsuit or directed verdict as to this issue would have had to be granted.

The trial court declined to withdraw such issue from the jury, which the prevailing opinion concedes was error, but concludes was harmless. My associates evidently do not regard this error as the possible source of serious consequences— a conclusion which under ordinary circumstances would be warranted. But, in the light of the character of the evidence received, who can say that the jury was not influenced in arriving at its verdict by a consideration of an issue tendered by the pleadings and upon which there was admittedly no proof? Particularly is this true when, by the instructions, the liability of the hospital, under the circumstances, was un-

limited. In other words, the jury was left to consider the question, upon which there was no evidence, in the light of the doctrine that the *mere admission of* a patient into a hospital would constitute negligence. With such a broad doctrine in mind as a measure of responsibility with respect to that particular charge of negligence, the jury very easily and erroneously could have reasoned on the same basis with respect to the other charges of negligence.

It is to be expected that infectious and contagious diseases are likely to appear in all hospitals, and it is a matter of common knowledge that isolation wards are established for patients afflicted with such diseases. When, under such circumstances, modern, improved and accepted methods are employed to reduce the hazard of contagion to a minimum, it would be a harsh doctrine, indeed, that would nevertheless charge a hospital with responsibility to a patient, who, in spite of such scientific safeguards, might happen to develop a contagious disease.

The issue of the hospital's responsibility for negligently admitting a patient was submitted to the jury, not only in the absence of evidence on the subject, but also without adequate, or any, instructions on the limit of its liability.

The prevailing opinion does not treat of the above question because, as is quoted therein, respondent admits that ''a hospital is not a guarantor against infection. Negligence must be proved beyond a mere possibility.'' The subject of guaranty is beside the issue, and respondent's admission on appeal affords appellants slight comfort as a remedy for the error of which they complain.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 22, 1936.